1
2
3
4
5
6
7
8                           **UNITED STATES DISTRICT COURT**

9                           **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  CARSON HYBRID ENERGY<br>STORAGE, LLC; CMD CARSON LLC,<br>12<br>Plaintiffs,<br>13<br>14   v.<br>15  TURLOCK IRRIGATION DISTRICT and<br>DOES 1 through 20,<br>16<br>Defendants.<br>17 | Case: 1:23-CV-460-JLT-EPG<br><br>ORDER GRANTING MOTION TO REMAND<br><br>(Doc. 17) |

18          This dispute arises from the claim that Defendant Turlock Irrigation District ("TID")

19   breached a contract to study the feasibility of Plaintiffs' battery energy storage project that would

20   "interconnect with TID's transmission system to deliver electricity to California and the Western

21   United States."  (Doc.  17 at 6.)  TID removed the suit to this Court pursuant to 28 U.S.C.

22   § 1441(a), claiming that Plaintiffs' complaint "contains various causes of action that are federal

23   questions".  (Doc. 1 at 4.)  Plaintiffs request remand of this action to Stanislaus County Superior

24   Court.

25                           **I.    FACTUAL BACKGROUND**

26          CMD Carson LLC and Carson Hybrid Energy Storage LLC (together, "Carson") are

27   affiliates developing battery storage projects in California.  (Doc. 1-1, Complaint, at ¶ 7–8, 13.)

28   One such project, the Soderquist Road Project, is a "nonflammable zinc battery storage project

                                               1

planned for Turlock, California," through which Carson intends to "sell energy and capacity at wholesale to California's consumers by participating in the California Independent System Operator (CAISO)[1] and the Western Energy Imbalance Market (WEIM)."  (*Id*. at 7, ¶ 14.)  TID is a "community-owned, not-for-profit, vertically integrated non-public electric utility organized pursuant to state law in central California performing irrigation, water, and electric services."  (*Id*. at 8, ¶ 16.)  The Soderquist Road project is located within TID's "balancing authority area" such that Carson cannot connect to its target energy markets (CAISO and WEIM) without first arranging for "interconnection and transmission service on [TID's] transmission system."  (*Id*. at 7–8, ¶ 15.)

Carson and TID entered into a contract, the Interconnection System Impact Study Agreement (the "Study Agreement" or "ISISA"), in early January 2021.  (Doc. 1-1 at 9, ¶ 22.) The purpose of this Study Agreement was for TID to "evaluate the interconnection of a generation resource"—Carson's battery project—with certain electric capacities at 601 Soderquist Road (the "Interconnection Study").  (*Id*. at ¶ 22.)  Carson provided funds for the Study.  (*Id*. at ¶ 22.)  TID delivered a Study Report with its findings on February 17, 2023.  (*Id*. at ¶ 66.)  Carson alleges that in the process of conducting the study and preparing the Report, TID breached the contract in a number of ways, including by, among other things:

- Removing agreed-upon study parameters in the course of its analysis, including that the battery "would be discharging during peak evening [demand and] charging during the solar day", (Doc. 1-1 at 12, 16, ¶¶ 41, 67);
- Adding new study parameters, (Doc. 1-1 at 17, ¶ 68);
- Failing to provide required deliverables, (Doc. 1-1 at 18, ¶¶ 72–73);
- Failing to address "follow-on obligations defined in Phase 3 of Attachment A of the Study Agreement", (Doc. 1-1 at 18, ¶ 75);
- Failing to issue itemized invoices for costs of the study unless Carson signed a not-

---

[1] CAISO an entity that operates California's wholesale energy markets. It is responsible for operating and maintaining California's electric transmission grid, including resolving transmission congestion and purchasing electric power to maintain system reliability.  *T & E Pastorino Nursery v. Duke Energy Trading & Mktg., L.L.C.*, 268 F. Supp. 2d 1240, 1244 (S.D. Cal. 2003).

previously-presented non-disclosure agreement, (Doc. 1-1 at 14, ¶¶ 52–54);

- Refusing to allow Carson to "arrange any necessary compensation" for third parties, "as defined in Section 7.1 of [the Study Agreement]", (Doc. 1-1 at 15, ¶ 59); and

- Prioritizing TID's own battery project in the "interconnection queue," which would give TID's battery project priority on "available power flow capacity in the transmission network," ultimately "forc[ing] Plaintiff's Soderquist project to increase power flow capacity in the Turlock electrical grid by paying for $33.8 million of power flow upgrades in order to achieve interconnection," (Doc. 1-1 at 17, ¶ 69).

## II.    PROCEDURAL HISTORY

Just prior to receiving the Study Report, on February 10, 2023, Carson filed an "Application for Order Under Federal Power Act Sections 210 and 211" with the Federal Energy Regulatory Commission ("FERC") requesting that FERC "issue an order requiring . . .[Turlock] to provide interconnection and transmission services for" the Project.  (Doc. 18-4 at 5 (Carson's "FERC Application").)  The FERC Application remains pending.  TID has filed a motion to dismiss the FERC complaint before FERC, and Carson has filed an opposition with FERC. (Docs. 18-5, 18-6.)

With the FERC Application pending, Carson filed a breach of contract action in California Superior Court on March 9, 2023.  Carson requested a Temporary Restraining Order ("TRO"), which the Superior Court granted pending a preliminary injunction hearing scheduled for May 12, 2023.  The focus of the TRO was Carson's place in TID's "interconnection queue."  Carson's complaint alleges that when the Study Agreement was signed, only one party was ahead of Carson in the queue.  (Doc. 1-1 at 8, ¶ 21.)  This project was a solar-generation project that did not have a battery; therefore, the study conducted for the Soderquist Project would need to model Carson's interconnection considering the power generated by the solar project.  (*Id*. at 8–9, ¶¶ 21, 23.)

Carson was purportedly assured that its place in the queue was determined in January

1   2021 when Carson signed the Study Agreement and advanced $50,000, (Doc. 1-1 at 8–9, ¶¶ 21–

2   22); however, by February 2023, Carson alleges that a battery project owned by TID had

3   "jumped" Carson in the queue.  (*Id*. at 16–17, ¶¶ 67–68.)  This meant that the battery project

4   ahead of Carson "may take advantage of available power flow capacity in the transmission

5   network without long lead-time and costly utility upgrades."  (*Id*. at 17, ¶ 69.)  Because Carson

6   was behind this project in the queue, it would require Carson to bear the costs of adding

7   additional power flow to the grid such to allow the interconnection of Carson's battery project.

8   (*Id*.)  Furthermore, the existence of the new battery project appeared to require new additional

9   studies to be done regarding the feasibility of interconnecting Carson's battery project.  TID

10   asked that Carson provide another $150,000 in funding for the further studies, and if funding was

11   not received, Carson would lose its place in the interconnection queue and risk even more costly

12   upgrades if another project took its place.  (*Id*. at 21, ¶¶ 91–92.)

13          The Superior Court's TRO prevented TID from removing Carson from the queue.  (Doc. 6

14   at 3; Doc. 1-1 at 175–76.)  Before the preliminary injunction hearing could take place, TID

15   removed the action to this Court.  Carson requested that this Court extend the TRO until a

16   preliminary injunction hearing could be held.  (Doc. 6.)  The parties eventually stipulated to

17   extend the TRO until July 20, 2023, to allow the Court to address the pending motions for remand

18   and dismissal.  (Doc. 24.)

19          In the present motion, Carson seeks remand of this dispute to the Superior Court.  Carson

20   argues that this is a mere contractual dispute about whether TID breached the Study Agreement,

21   which explicitly states that it is to be "governed by the laws of the State of California" such that

22   all litigation arising out of or relating to the Study Agreement "shall be brought in a court of

23   competent jurisdiction located in Stanislaus County".  (Doc. 1-1 at 28, Exhibit 1 ¶ 8.2; Doc. 22 at

24   3.)  TID counters that the Court has jurisdiction because Carson's "right to relief depends on the

25   resolution of a substantial, disputed federal question."  (Doc. 18 at 8.)[2]  TID further argues that

26   federal law creates Carson's cause of action such that Section 317 of the Federal Power Act

27

28   [2] TID's Notice of Removal contains several grounds for removal which appear abandoned in TID's briefing of this
     motion.  Because TID bears the burden of demonstrating proper jurisdiction, the Court will address only the
     arguments that TID has briefed.

4

1  ("FPA"), 16 U.S.C. § 825p, vests jurisdiction in this Court.  (Doc. 18 at 8.)

2  ## III.    LEGAL STANDARD

3  "Federal courts are courts of limited jurisdiction," possessing "only that power authorized

4  by Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377,

5  (1994).  Only state court actions that could have originally been filed in federal court may be

6  removed to federal court by the defendant.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392

7  (1987).  Absent diversity of citizenship, which is not claimed here, federal question jurisdiction is

8  required.  The presence or absence of federal jurisdiction under 28 U.S.C. § 1331 is "governed by

9  the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a

10  federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Id*.

11  Federal question jurisdiction exists in "all civil actions arising under the Constitution, laws, or

12  treaties of the United States."  28 U.S.C. § 1331.

13  A case can "aris[e] under" federal law in two ways.  Most directly, a case arises under

14  federal law when federal law creates the cause of action asserted.  *See American Well Works Co.*

15  *v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) ("A suit arises under the law that creates the

16  cause of action").  In these cases, 28 U.S.C. § 1441(c) confers original jurisdiction to the court.

17  Where federal law does not create the cause of action asserted, the Supreme Court has "identified

18  a 'special and small' category of cases in which 'arising under' jurisdiction still lies" where the

19  complaint "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a

20  federal forum may entertain without disturbing any congressionally approved balance of federal

21  and state judicial responsibilities."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable &*

22  *Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005).)

23  Federal courts "strictly construe the removal statute against removal jurisdiction" and all

24  doubts are to be resolved in favor of remand.  *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.

25  1992).  When, as here, a party removes a case to federal court under 28 U.S.C. § 1446, that party

26  bears the burden of establishing jurisdiction exists.  *Kokkonen*, 511 U.S. at 377; *Gaus* 980 F.2d at

27  566.

28  ///

5

# IV.    ANALYSIS

## A.    Federal Law Does Not Create Carson's Cause of Action

"Most federal-question jurisdiction cases are those in which federal law creates a cause of action." *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002).  Looking to the face of the complaint, Carson only states one cause of action: for breach of contract under California law, where the contract at issue expressly states that it is governed by California law.  (Doc. 1-1 at ¶¶ 93–101.)  Carson's complaint also requests specific performance as a remedy for the alleged breach.

TID claims that Carson's suit is "nominally posited on state law breach of contract claims" but is really "dependent on whether TID's conduct conformed to the requirements of FPA Sections 210 and 212 (16 U.S.C. § 824i, 824k), and FERC orders and regulations issued under these provisions."  (Doc. 18 at 15.)  Lawsuits "brought to enforce any liability or duty created by, or to enjoin any violation of" the FPA or "any rule, regulation, or order thereunder" are governed by FPA Section 317, which grants jurisdiction to the federal courts.  16 U.S.C. § 825p.[3]

In support of the argument that Section 317 applies to this dispute, TID points to Carson's accusation that TID "failed to provide 'non-discriminatory' access" and "violated its obligations as a non-discriminating transmission provider" when it placed its own battery project ahead of Carson's in the interconnection queue.  (Doc. 18 at 15–16, citing Doc. 1-1, Complaint, at ¶ 86.)  According to TID, any non-discrimination obligations arise from Section 212 of the FPA, which requires transmitting utilities to offer rates "not unduly discriminatory" when the utilities are subject to an "order under [16 U.S.C.] section 824j," which is Section 211 of the FPA.  (Doc. 18 at 16, citing 16 U.S.C. § 824k.)  A plain reading of Sections 211 and 212 make clear that they do not apply to this dispute.

Section 212 only applies where an order has issued under Section 211.  Section 211 permits any entity "generating electric energy" to apply to FERC for an "order under this

---

[3] Carson argues that Section 317 does not apply in this case because TID is neither a public utility nor a holder of a FERC-approved tariff subject to this provision of the FPA.  (Doc. 17 at 20–21; Doc. 22 at 9–11.)  The Court need not address this issue, as TID's argument fails substantively on other grounds.

1  subsection requiring a transmitting utility to provide transmission service."  16 U.S.C. § 824j(a).

2  FERC has not issued such an order for required transmission in this case.  Though Carson applied

3  for a Section 211 order in February 2023, its petition remains pending.  Further, Carson's motion

4  to remand clarifies that TID's obligation to provide non-discriminatory access does *not* "arise[]

5  solely under FPA Section 212(a)" as TID claims in its opposition.  (Doc. 18 at 16.)  Instead,

6  Carson "alleges that by acting in a discriminatory manner," TID acted contrary to its *own*

7  promise—published on TID's website and reiterated in communications with Carson—to provide

8  non-discriminatory access, which Carson states "breached the basic bargain underlying the Study

9  Agreement."  (Doc. 17 at 20.)

10         Aside from the discrimination claims, TID understands Carson to be "challeng[ing] other

11  conduct relating to TID's provision of interconnection service under Sections 210 and 212 of the

12  FPA."  (Doc. 18 at 16.)  This "other conduct" includes allegations that TID improperly altered the

13  parameters of the Study and conducted portions of the Study improperly.  TID argues that

14  because Carson complained of this same conduct in its pending FERC petition, the complaints

15  must constitute "alleged violations of TID's obligations under Sections 210 and 212 of the FPA."

16  (Doc. 18 at 17.)

17         However, like Carson's complaint in this case, Carson's FERC petition does not allege

18  that TID violated the FPA; it merely asks FERC to issue an interconnection order pursuant to its

19  power under FPA Sections 210 and 211 because Carson's negotiations with TID were not

20  ultimately fruitful.  (Doc. 18-4 at 5–6.)  The petition includes details about Carson's interactions

21  with TID in order to "demonstrate[] that Carson has gone above and beyond the Commission's

22  requirement of a Good Faith Request" and to demonstrate that TID is unlikely to provide

23  interconnection to Carson without FERC intervention.  (Doc. 18-4 at 45, 55–56.)  The inclusion

24  of these details does not, as TID implies, mean that Carson was alleging FPA violations.  Further,

25  TID provides no authority suggesting—and the Court is aware of none—that petitions for

26  interconnection must necessarily allege FPA violations.

27         This case is unlike *T&E Pastorino Nursery v. Duke Energy Trading & Mktg., L.L.C.*,

28  which TID cites in favor of its position.  268 F. Supp. 2d 1240, 1244, 1246–47 (S.D. Cal. 2003),

1  *aff'd* 123 F. Appx 813 (9th Cir. 2005).  There, the court found that plaintiffs' state law cause of

2  action for unfair business practices and breach of contract was actually federally created because

3  the energy contracts at issue were governed by a FERC "regulation" as defined in Section 317.

4  Specifically, the parties' contractual duties in *T&E* "ar[o]se under the terms" of a FERC-approved

5  tariff, and any breach of contract claims were "necessarily based on an assumed violation of the

6  tariff itself."  Because FERC-approved tariffs are "regulations" under the FPA, federal law

7  created the cause of action and Section 317 applied.  *Id*.  Here, though, there is no such tariff or

8  other comparable rule or regulation underpinning Carson's claims.  TID has failed to demonstrate

9  that Carson's breach of contract claim is federally created.[4]

10  **B.    There Is No Substantial Question of Federal Law**

11  TID next argues that even if federal law does not create Carson's cause of action,

12  Carson's ultimate "right to relief depends on the resolution of a substantial, disputed federal

13  question."  (Doc. 18 at 8, citing *ARCO Env't Remediation, L.L.C. v. Dep't of Health & Envtl.*

14  *Quality of Montana*, 213 F.3d 1108, 114 (9th Cir. 2000).)  The Supreme Court has established

15  that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised,

16  (2) actually disputed, (3) substantial and (4) capable of resolution in federal court without

17  disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258

18  (2013).

19  "A federal issue is necessarily raised if it is 'basic,' 'necessary,' 'pivotal,' 'direct,' or

20  'essential' to the claim." *Tri-Dam v. Frazier*, No. 22-15246, 2023 WL 3193592, at \*2 (9th Cir.

21  May 2, 2023) (citing *Lippitt v. Raymond James Fin. Servs, Inc.*, 340 F.3d 1033, 1045 (9th Cir.

22  2003) (internal quotations omitted)).  TID represents that this element is met because the Study

23  Agreement required TID to conduct the Study "consistent with Good Utility Practice" and to

24  "consider the full Generating Capacity due to safety or reliability concerns."  (Doc. 18 at 10,

25  citing Doc. 18-8, TID's Responses to Carson's Information Requests.)

26

27  [4] To be clear, Carson's complaint makes reference to some federal law and standards.  But, as discussed in the
following section, "the mere reference of a federal statute in a pleading will not convert a state law claim into a

28  federal cause of action if the federal statute is not a necessary element of the state law claim and no preemption
exists."  *Easton v. Crossland Mortgage Corp.*, 114 F.3d 979, 982 (9th Cir. 1997).

1    According to TID, this quoted language is "based upon FERC's *pro-forma* Large

2  Generator Interconnection Procedures" such that "the FPA and FERC regulations and orders do

3  more than 'provide some background to explain the parties' contractual duties'. . . the FPA and

4  FERC regulations and orders *establish* TID's duties under the Study Agreement." (Doc. 18 at

5  10.)  As such, TID argues that analyzing whether it breached its duties under the contract would

6  require the Court to "look to the FPA and FERC implementing orders" that define "Good Utility

7  Practice". (Doc. 18 at 10–11.)  In other words, TID argues that because it imported a term from a

8  federal law, interpretation of the contract requires interpretation of federal law as to the imported

9  term.  TID also argues that determining whether TID improperly withheld certain information

10  from Carson would require the Court to determine whether that information was Critical Electric

11  Infrastructure Information ("CEII") as defined by federal law. (*Id.* at 11.)

12    Carson disagrees.  Importantly, Carson's complaint contains only one cause of action

13  alleging that TID breached the contract in many ways, only some of which involve TID's actual

14  conducting of the Study or withholding information that may constitute CEII.  Other alleged

15  breaches include TID's failure to allow for payments of third parties, failure communicate with

16  CAISO, and improperly delaying the project, among other things. (Doc. 22 at 4; *see also* Doc. 1-

17  1, Complaint, at ¶ 97.)  TID has not argued that analysis of *these* alleged breaches would

18  necessarily require interpretation of federal law.  When a claim can be supported by alternative

19  and independent theories—one of which is a state law theory and one of which is a federal law

20  theory—federal question jurisdiction does not attach because federal law is not a necessary

21  element of the claim. *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 675 (9th Cir. 2012) (citing

22  *Rains v. Criterion Sys., Inc.*, 80 F.3d 339, 346 (9th Cir. 1996)); *see also Merced Irr. Dist. v. Cnty.*

23  *of Mariposa*, 941 F. Supp. 2d 1237, 1271–73 (E.D. Cal. 2013).  Under these circumstances,

24  Carson could prevail in its one breach of contract count without need for the Court to decide any

25  issues of federal law.  In other words, construction of federal law is not "necessary" to Carson's

26  case.

27    Furthermore, as to Carson's breach allegations that may implicate federal standards

28  regarding "Good Utility Practice," the issue is not substantial in the relevant sense.  The

1  substantiality inquiry under *Grable* looks to the importance of the issue to the federal system as a

2  whole, not on the importance of the issue to plaintiff's case.  *Gunn*, 568 U.S. at 260.  A federal

3  interest may be substantial when it "raises substantial questions as to the interpretation or validity

4  of a federal statute," "challenges the functioning of a federal agency or program," "is a pure issue

5  of law that directly draws into question the constitutional validity of an act of Congress," or

6  "challenges the actions of a federal agency, and a ruling on the issue is both dispositive of the

7  case and would be controlling in numerous other cases." *City of Oakland v. BP PLC*, 969 F.3d

8  895, 901 (9th Cir. 2020) (internal citations and quotations omitted).

9       An illustration of the sort of substantiality required comes from *Smith v. Kansas City Title*

10 *& Trust Co.,* 255 U.S. 180 (1921), which the Supreme Court has described as "[t]he classic

11 example" of a state claim arising under federal law.  *Grable*, 545 U.S. at 312 (2005).

12      In *Smith,* the plaintiff argued that the defendant bank could not
        purchase certain bonds issued by the Federal Government because
13      the Government had acted unconstitutionally in issuing them. 255
        U.S., at 198. [The Supreme Court] held that the case arose under
14      federal law, because the "decision depends upon the determination"
        of "the constitutional validity of an act of Congress which is directly
15      drawn in question." *Id.,* at 201.  Again, the relevant point was not
        the importance of the question to the parties alone but rather the
16      importance more generally of a determination that the Government
        "securities were issued under an unconstitutional law, and hence of
17      no validity." *Ibid.*; see also *Merrell Dow Pharmaceuticals Inc. v.*
        *Thompson,* 478 U.S. 804, 814, n. 12 (1986).

18 *Gunn v. Minton*, 568 U.S. at 261. Even assuming that evaluating Carson's breach of contract

19 claim would require this Court to interpret federal guidance as to what constitutes "Good Utility

20 Practice,"[5]  this federal issue does not rise to the level of significance described in *Smith*.

21 Importantly, federal issues are not substantial where they are "fact-bound and situation-specific,"

22 or where they raise only a hypothetical question unlikely to affect interpretations of federal law in

23 ─────────────

24 [5] It is not clear that FERC's definition of "Good Utility Practice" is actually controlling in this case, as the contract at issue here does not define the term as requiring such.  (Doc. 1 at 45, Appendix A.)  Though the contract's definition
25 of "Good Utility Practice" mirrors FERC's definition, the contract does not require that "Good Utility Practice" be measured by FERC's interpretation of that term.

26 TID has provided no authority suggesting that its import of a term or definition from a federal source into a private contract renders interpretation of that contract a federal issue for jurisdictional purposes.  To the contrary, even where
27 "federal tariffs [] have been incorporated by reference into the contracts at issue," the federal issue is not substantial if the contracts, as here, specify that they "are to be interpreted and governed solely by California law rather than by
28 federal law." *Pac. Gas & Elec. Co. v. Arizona Elec. Power Coop., Inc.*, 479 F. Supp. 2d 1113, 1123 (E.D. Cal. 2007).

the future.  *City of Oakland*, 969 F.3d at 905 (internal citations omitted).  As Carson points out in its reply, what qualifies as "Good Utility Practice" according to FERC is "fact specific and varies by region."  (Doc. 22 at 5–6, citing FERC Order 888, 61 FR 21540-01, at 21708, 1996 WL 239663 (1996)); *see also Standardization of Generator Interconnect Agreements & Procedures*, Order No. 2003, 104 FERC ¶ 61,103 at P 56 (2003) (defining Good Utility Practice as "any of the practices, methods and acts generally accepted in the region".)

And while TID asserts that this Court's analysis of "Good Utility Practice" would be "controlling in numerous other cases," TID provides no evidence or applicable case law in support of this point. (Doc. 18 at 13.)  Instead, TID merely argues that the federal government has a "strong interest in maintaining control over interconnection processes, provision of transmission, reliability standards, and protection of CEII." (*Id*.)

In support of its position, TID cites *Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179, 1185 (9th Cir. 2022).  However, the federal interest recognized in *Sauk-Suiattle* was that of maintaining control over *FERC-licensed projects*, which are clearly distinguishable from the contract and project at issue here.  56 F.4th at 1185 (emphasis added).  TID also cites *Carrington v. City of Tacoma, Dep't of Pub. Utilities, Light Div.*, which is similarly inapposite because it involves "FERC's exclusive control" of "FERC-licensed dam operations."  276 F. Supp. 3d 1035, 1042 (W.D. Wash. 2017).  Further, *Carrington* was a negligence case in which the only source for defendants' duty of care was a FERC license.  *Id*. ("Because it is necessary to interpret TPU's FERC license to determine the duty of care, Plaintiffs' claims implicate a substantial issue of federal law. The FPA provides a comprehensive regulatory structure and prescribes an arduous licensing procedure to establish guidelines for dam operations.").  TID has not demonstrated how FERC has the same comprehensive control over this dispute as in the dam-related cases when TID admits plainly that it does not maintain a FERC tariff and is exempt from FERC's rate regulation.  (Doc. 15 at 8, 15, TID's Motion to Dismiss.)

In sum, TID's arguments are not compelling.  Because TID has not established that any potential federal issues in this state law breach of contract action are "necessary" or "substantial", the Court need not opine as to whether federal resolution of this dispute would disturb the federal-

state balance.  The Court concludes that there is no substantial federal question providing a proper basis for jurisdiction under 28 U.S.C. § 1441.

## V.    CONCLUSION AND ORDER

For the reasons set forth above, the motion to remand (Doc. 17) is **GRANTED**.  The matter is remanded to the Superior Court for the County of Stanislaus.  As such, the Court declines to address the pending motion to dismiss (Doc. 15).

IT IS SO ORDERED.

Dated:   **June 20, 2023**

UNITED STATES DISTRICT JUDGE